**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON**

**CRIMINAL CASE NO. 22-35-DLB-CJS**

**UNITED STATES OF AMERICA**                                                                **PLAINTIFF**

vs.                              **REPORT AND RECOMMENDATION
AS TO DEFENDANT'S MOTION TO SUPPRESS**

**ADAM K. LANG**                                                                                    **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on Defendant Adam Lang's Motion to Suppress (R. 18). The Government responded to the Motion (R. 19), and an evidentiary hearing was held on September 27, 2022 (R. 23). Lang filed a supplemental memorandum following the hearing (R. 27), to which the United States responded (R. 28). The Motion is now ripe for consideration and preparation of a report and recommendation by the undersigned pursuant to the Standing Referral Order (R. 6). *See* 28 U.S.C. § 636(b)(1)(B).[1] For the reasons discussed below, it will be recommended that the Motion to Suppress (R. 18) be **denied**.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The facts surrounding Lang's suppression motion are based on testimony and video footage of the events that transpired during a traffic stop on March 2, 2022. The parties stipulated to the accuracy and admissibility of the officers' body camera footage pertaining to the traffic stop. (*See* R. 22 (Officer Feldman's body camera stipulated as Joint Exhibit 1; Officer Rowland's body camera stipulated as Joint Exhibit 2); *see also* R. 26 at Page ID 60-63 (admitting joint exhibits)). At the evidentiary hearing, the United States called two witnesses—Officers Patrick Feldman and

---

[1] See *United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

Michael Rowland—to testify about the alleged events that transpired leading up to and during Lang's traffic stop. (*See* R. 23; R. 24; R. 26). The following is a chronological version of the events elicited from testimony and video footage from body cameras of the traffic stop and arrest.

### A.   The Traffic Stop[2]

On March 2, 2022, Officer Patrick Feldman of the City of Highland Heights Police Department stopped a vehicle on the interstate for expired registration and a broken windshield. (Page ID 64-65; Joint Ex. 1 at 00:49). Officer Feldman testified that the stretch of highway where the traffic stop occurred was very busy and had a shoulder "approximately 6 to 8 feet" wide, placing him close to passing cars when conducting the traffic stop. (Page ID 65-66). Officer Feldman exited his cruiser, approached the passenger's side of the vehicle, and asked the passenger (Defendant Lang) to lower the passenger window. (Page ID 66; Joint Ex. 1 at 00:40). Lang indicated that the window was broken and opened the passenger door. (*Id.*). Officer Feldman testified that when Lang opened the passenger door, he observed a digital scale located in the pocket of the door. (Page ID 67). The scale is visible in Officer Feldman's body camera footage. (Joint Ex. 1 at 00:45).

Officer Feldman continued with the traffic stop, asking for insurance for the vehicle and identification for both the driver and Lang. (*Id.*; Joint Ex. 1 at 1:29). The driver stated she had a driver's license but that it might take time for her to find it. (Joint Ex. 1 at 1:35-2:10). During this exchange, Officer Feldman told the driver that he could not hear her and that she needed to speak up. (Joint Ex. 1 at 1:35). Lang stated he did not have a physical ID and refused to verbally provide identifying information, claiming that he was not required to do so as a passenger. (Page ID 68;

---

[2]   Unless otherwise indicated, Page ID numbers refer to the transcript of the evidentiary hearing (R. 26).

Joint Ex. 1 at 2:15). Officer Feldman asked the driver to provide her identifying information verbally. (Page ID 67). The driver provided her first and last name, how to spell both names, her date of birth, her social security number, and the fact that she had an Ohio ID. (Joint Ex. 1 at 2:49-3:40). Officer Feldman testified that, at that time, he did not know who the passenger of the vehicle was or whether he had any outstanding warrants, or whether the driver was in fact who she identified herself to be. (Page ID 68).

While circling the rear of the car to the driver's side, Officer Feldman told another officer who had arrived at the scene, Officer Michael Rowland, also of the City of Highland Heights Police Department, that he was "gonna get her [the driver] out." (Joint Ex. 1 at 3:40). Officer Feldman asked the driver to exit the vehicle because he could not hear her. (Joint Ex. 1 at 3:52). Officer Feldman testified that he had the driver exit the vehicle because the passing traffic was close in proximity making it both difficult to hear and dangerous. (Page ID 69, 82-83, 96). Officer Feldman further testified that the driver was "hesitant" to exit the vehicle and "overly nervous for a basic traffic violation." (Page ID 96-97; Joint Ex. 1 at 3:50). Officer Feldman directed Officer Rowland to have Lang exit the vehicle and to determine his identity. (Page ID 69, 106; Joint Ex. 1 at 4:25). Officer Feldman conducted a roadside interview of the driver at the front of the suspect vehicle, some distance away from Lang and Officer Rowland. (Page ID 70-71).

### 1. Officer Feldman interviews the driver then searches the vehicle

Officer Feldman's interview of the driver lasted approximately seven and a half minutes. (Joint Ex. 1 at 5:10-12:45). That interview started with questions pertaining to where she was coming from and going to; where she lived; and her relationship with Lang. (*Id.*). Officer Feldman

subsequently asked for and received the driver's consent to search the vehicle.[3] (Page ID 71-72, 86; Joint Ex. 1 at 6:18). Officer Feldman informed the driver that he wanted to search the vehicle because he observed a digital scale in the passenger door. (Page ID 72; Joint Ex. 1 at 6:18 (stating also faulty registration and broken windshield)). Officer Feldman testified that the driver appeared surprised when he described the scale. (Page ID 72). Officer Feldman questioned the driver about both her and Lang's drug use. (*Id*.; Joint Ex. 1 at 6:18). The driver indicated that she heard Lang used methamphetamine. (*Id*.). Officer Feldman testified that the driver described Lang as a habitual methamphetamine user. (Page ID 72).

After having the driver verify her information and informing her that providing false information to an officer is an arrestable offense in Kentucky, Officer Feldman provided the driver's information to dispatch. (Page ID 73-74; Joint Ex. 1 at 8:24-9:50). Before hearing back from dispatch, Officer Feldman questioned the driver about her criminal history, specifically, whether she had ever been arrested or had any speeding tickets. (Joint Ex. 1 at 9:25-10:14). Shortly thereafter, dispatch responded,[4] and Officer Feldman replied with "gotcha." (Joint Ex. 1 at 10:15). Officer Feldman continued to question the driver about the credibility of her excuse that they were actively headed to the BMV to fix her registration. (*Id*.). Officer Feldman concludes his interview by conducting a consensual cursory search of the driver's pockets. (Joint Ex. 1 at 11:10). After finishing his cursory search, Officer Feldman directed the driver to stand next to Officer Rowland and he proceeded to search the vehicle. (Joint Ex. 1 at 11:10-12:10).

---

[3] Officer Feldman also asked for and received the driver's consent to have a female officer search her person. (Page ID 72). A female officer later responded to the scene and searched the driver, but nothing illegal was found on her person. (Page ID 72-73).

[4] Dispatch's response is inaudible in the body camera footage. Officer Feldman did not testify whether this response was a confirmation of the driver's information.

The search of the vehicle lasted approximately 18 minutes. (Joint Ex. 1 at 12:45-30:54). Officer Feldman found what he believed to be drug paraphernalia, including a digital scale, unused capped syringes, premeasured vials of water, and Q-Tips with cotton pulled off. (*Id.*; Page ID 75-76). Officer Feldman testified that, according to his training and experience, drug users tend to pull cotton from the ends of a swab and place it in water to filter narcotics. (*Id.*). Officer Feldman further testified that, according to his training and experience, the presence of the items together suggested that it was drug paraphernalia. (*Id.*). Officer Feldman clarified that all of the drug paraphernalia was found within reach of Lang. (*Id.* at Page ID 93, 102).

### 2. Officer Rowland interviews Lang

During Officer Feldman's interview of the driver and subsequent search of the vehicle, Officer Rowland had Lang exit the vehicle and interviewed him some distance away from the driver and Officer Feldman. (Page ID 106-07; Joint Ex. 2 at 3:50). That interview lasted approximately 26 minutes. (Joint Ex. 2 at 4:05-30:35). Lang initially identified himself first as Adam Lang. (Page ID 106-07; Joint Ex. 2 at 4:12). Officer Rowland questioned Lang regarding his travel plans, whether he had a physical ID, and whether he had anything illegal or dangerous on his person. (*Id.*). Lang informed Officer Rowland that he had recently been released from Boone County after serving five and a half months for assault. (Page ID 111; Joint Ex. 2 at 4:30). Lang also noted that he did not have ID. (Page ID 107-08).

Officer Rowland again asked Lang for his name and this time Lang refused. (*Id.*). Officer Rowland testified that he and Lang had a "back and forth" about providing identifying information. (*Id.*; Joint Ex. 2 at 4:30-11:00). Lang ultimately identified himself as Nicolas Jason Lang and gave a date of birth. (Page ID 108-09; Joint Ex. 2 at 11:05-12:12 (Nicholas Lang), 23:15 (middle name Jason)). However, Lang could not provide a social security number. (Page ID 109; Joint Ex. 2 at

5

22:35). Officer Rowland continued to question Lang about his line of work and his criminal history. (Joint Ex. 2 at 16:00-30:00).[5] Officer Rowland informed Lang that providing false identifying information to a police officer is an arrestable offense in Kentucky. (Page ID 110; Joint Ex. 2 at 30:14). Lang verified that the information he provided was accurate. (*Id*.). Officer Rowland testified that he could not immediately check the information provided by Lang because Officer Feldman was "still dealing with the [driver] and then Officer Feldman began searching the vehicle when I was talking with the [driver] and Mr. Lang." (*Id*. at 108-09).

### 3. Officer Feldman Interviews Lang

After completing his search of the vehicle, Officer Feldman interviewed Lang away from the driver and Officer Rowland. (Page ID 75-79; Joint Ex. 1 at 31:25-40:15). Officer Feldman questioned Lang about his drug use, what the scale, needles, cotton swabs, and vials of water were used for, his relationship with the driver, his line of work, and the driver's drug use. (*Id*.). Lang insisted the digital scale was used to measure coins, the hypodermic needles were used for insulin, and the premeasured vials of water were used for breathing treatments for the driver's daughter. (Page ID 77-79; Joint Ex. 1 at 31:25-40:15). Officer Feldman testified that he did not find Lang's excuses for the items credible. (Page ID 77-78, 99). Officer Feldman directed Lang to stay with the female officer and presented the drug paraphernalia to the driver. (Page ID 79; Joint Ex. 1 at 40:15). The driver stated that the drug paraphernalia did not belong to her and that it must have been placed in her purse by Lang. (Page ID 79-80, 119; Joint Ex. 1 at 41:00).

### 4. The Officers Search and Arrest Lang

While Officer Feldman was questioning Lang, Officer Rowland returned to his cruiser and checked the identifying information provided by Lang. (Page ID 108-11; Joint Ex. 2 at 30:35-

---

[5] At some point during Officer Rowland's interview with Lang, the driver joined, and Officer Rowland also questioned the driver about her line of work. (Joint Ex. 2 at 16:20-17:05).

6

37:30). Officer Rowland testified that it would be "very easy to find somebody if they have any prior cases." (Page ID 111). Officer Rowland further testified that the system did not return a hit when using the information provided by Lang, leading him to believe that Lang had not been truthful. (Page ID 112; Joint Ex. 2 at 30:35-37:30). When he completed the information check, Officer Rowland exited his cruiser and questioned the driver about Lang's identity. (*Id.*; Joint Ex. 2 at 37:30). The driver informed Officer Rowland that she knew Lang as "Nick." (*Id.*). Officer Rowland testified that at that point "he was under the belief that [Lang] was lying to [him] about [Lang's] name." (Page ID 112-13).

After confirming with the driver that the drug paraphernalia did not belong to her, Officer Feldman informed Officer Rowland for the first time that he had found drug paraphernalia in the vehicle. (Page ID 80, 113; Joint Ex. 1 at 45:55; Joint Ex. 2 at 45:15). It was at that point that the officers decided to search Lang's person. (Page ID 113; Joint Ex. 1 at 46:15; Joint Ex. 2 at 45:35). The officers found two separate quantities of methamphetamine, an amount of fentanyl, and a glass pipe typically used for methamphetamine. (Page ID 113-14; Joint Ex. 1 at 47:15; Joint Ex. 2 at 46:30). The officers handcuffed Lang and placed him inside a police cruiser. (Page ID 114; Joint Ex. 1 at 47:15). The methamphetamine the officers obtained from Lang's person was the basis for the federal charges brought against Lang. (*See* R. 1).

  **B.** **Procedural History**

On May 12, 2022, the federal grand jury at Covington returned an Indictment charging Lang with one count of possession with the intent to distribute 50 grams or more of methamphetamine. (R. 1). Lang initially appeared and was arraigned on June 1, 2022, where he pleaded not guilty. (R. 10). Lang filed the pending Motion to Suppress all evidence obtained from the search of his vehicle and his person. (R. 18). The Government responded (R. 19) and the

Court held an evidentiary hearing on the issue. (R. 23). At the conclusion of the hearing, the Court granted Lang's unopposed oral motion for a transcript of the hearing and for leave to file a post-hearing brief. (*Id*. at ¶ 2). The parties filed their respective post-hearing briefs (R. 27; R. 28) and the Motion is ripe for adjudication.

**II.   ANALYSIS**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…[.]" U.S. Const. amend. IV. The parties do not dispute that Lang's traffic stop constituted a seizure within the meaning of the Fourth Amendment, *Whren v. United States*, 517 U.S. 806 (1996), or that Lang has standing to challenge the seizure, *Brendlin v. California*, 551 U.S. 249 (2007). *See United States v. Bah*, 794 F.3d 617, 626-27 (6th Cir. 2015). Moreover, Lang conceded that Officer Feldman had probable cause to initially stop the vehicle. (R. 27 at Page ID 127); *see United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008).

Instead, Lang moved to suppress the Government's evidence on two grounds: first, that the officers impermissibly abandoned the traffic stop when, without reasonable suspicion, they removed the driver and Lang from the vehicle and questioned them about narcotics (R. 27 at Page ID 128); and second, that "the items located by the officers during a search of the vehicle did not rise to the level of probable cause to search Mr. Lang." (R. 27 at Page ID 135). The United States argued (1) that the officers did not prolong the traffic stop, (2) that even if the officers prolonged the traffic stop, they had reasonable suspicion to do so, and (3) that the officers had probable cause to search Lang's person. (R. 28 at Page ID 163). Thus, the Court first turns to whether the officers abandoned the traffic stop, and if so, whether that abandonment was supported by reasonable suspicion.

A.     **The officers did not impermissibly prolong the traffic stop**

The Supreme Court has determined that a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  Since traffic stops are generally brief encounters, the stop is more akin to a *Terry* stop than a formal arrest.  *See Knowles v. Iowa*, 525 U.S. 113, 117 (1998).  Thus, like a *Terry* stop, the duration and scope of an officer's inquiry is determined by the seizure's "mission," meaning "to address the traffic violation that warranted the stop" and "attend to related safety concerns[.]"  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  In general, the "mission" is complete and the officer's authority to detain a person ends, "when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.* at 355.  An officer's mission during a typical traffic stop includes determining whether to issue a citation, "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration."  *Id*.  If an officer exceeds the mission of the traffic stop, his detour must be supported by reasonable suspicion.  *United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022).  This is true even when the detour is *de minimis*.  *Id*.

Lang argued that "Officer Feldman initiated [a] criminal investigation when he found the scale, and had [the occupants] exit the vehicle."  (R. 27 at Page ID 129).  In other words, removing the occupants from the vehicle "converted a lawful traffic stop into a criminal investigation" and required reasonable suspicion.  (*Id*. at Page ID 128).  Lang relied on three cases in support of his position.  *See, e.g.*, *Whitley*, 34 F.4th 522; *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011); and *United States v. Chivers*, No. 1:19-cr-119, 2020 WL 5757135 (S.D. Ohio Sept. 28, 2020).

9

It is well-established that law enforcement may remove the driver of a lawfully stopped vehicle as a matter of course, that is, without reasonable suspicion. *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977). That rule applies equally to passengers in a vehicle. *See Maryland v. Wilson*, 519 U.S. 408 (1997); *see also United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). "[A]n officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356. "This is so, in large part, because traffic stops are 'fraught with danger' for police officers." *Pacheco*, 841 F.3d at 390. In other words, legitimate safety concerns are incidental to the typical traffic stop. Thus, the officers were permitted to remove both the driver and Lang from the vehicle without having to show independent reasonable suspicion.

*Whitley* is not to the contrary. In *Whitley*, officers removed a driver from a lawfully stopped vehicle solely to investigate a scale they observed on the driver's lap. 34 F.4th at 527. The Sixth Circuit determined that removing the driver from the vehicle constituted a detour and therefore required independent reasonable suspicion. *Id*. at 530. This was "because the request facilitated the investigation into the scale and did not pertain to the original traffic stop." In other words, the officers did not have a legitimate safety concern to justify removing the occupant from the vehicle. *See Rodriguez*, 575 U.S. at 356. The officers in *Whitley* "explicitly stated their purpose in continuing the stop was to 'investigate the scale.' This meant that the stop [then] became concerned with the scale and Whitley's possible drug-related activity." *Id*. at 532.

Here, unlike *Whitley*, the officers had legitimate reasons for removing the driver and Lang from the vehicle. Officer Feldman testified that the stretch of highway where the traffic stop occurred was very busy and had a shoulder "approximately 6 to 8 feet" wide, placing him close to passing cars when conducting the traffic stop. (Page ID 65-66). Officer Feldman further testified

10

that he removed the driver from the vehicle because the passing traffic was close in proximity making it both difficult to hear and dangerous. (Page ID 69, 82-83, 96). Officer Feldman's testimony was corroborated by the fact that he asked the driver to repeat herself several times when requesting her identifying information. (Joint Ex. 1 at 1:35 and 3:52). Thus, it was proper for Officer Feldman to remove the driver from the vehicle to confirm her identifying information—a task tied to the traffic stop. *Rodriguez*, 575 U.S. at 355. Regardless, given his proximity to passing traffic, Officer Feldman's legitimate safety concern warranted removing the occupants from the vehicle. *See Whitley*, 34 F.4th at 530; *see also United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010).

Lang cited *Beauchamp* solely for the proposition that the Court's inquiry into the officers' reasonable suspicion to remove the occupants from the vehicle should be limited to what the officers knew at the time of removing the occupants. (*See* R. 27 at Page ID 129-30) ("reasonable suspicion to make a stop cannot be justified by facts that become apparent only after the seizure.") (quoting *Beauchamp*, 659 F.3d at 571). In the context of seizures that require reasonable suspicion, the point is well-taken. But as already discussed, the officers here did not need reasonable suspicion to remove the occupants from the vehicle. *See Mimms*, 434 U.S. at 110-11; *Wilson*, 519 U.S. at 414-15. Their "legitimate and weighty interest" in safely completing the stop was enough. *Rodriguez*, 575 U.S. at 356; *Whitley*, 34 F.4th at 530. In addition, *Beauchamp* did not involve the government's removal of an occupant from a vehicle. *See* 659 F.3d at 564.

Lang also cited to *Chivers* at length. (*See* R. 27 at Page ID 130-33). In *Chivers*, a driver was pulled over for speeding. *Chivers*, 2020 WL 5757135, at *2. There were three passengers in the vehicle and two officers conducted the stop. *Id.* After the officers obtained identifying information, one officer ran the information while the other officer began questioning the

11

passengers about other unrelated potential crimes. *Id.* After the officer running the information had finished, he decided to discontinue writing the ticket to also question the passengers about unrelated crimes. *Id.* at *3. After talking to the passengers again and finding inconsistencies in their stories, the officers reentered their police vehicle to discuss whether they should call a drug dog to conduct a sniff of the vehicle. *Id.* The officers eventually learned that a drug dog was nearby and asked that it be brought to the traffic stop. *Id.* at *4. The officers waited approximately eight minutes for the dog to arrive. *Id.* While waiting on the dog to arrive, the officers questioned the driver about the vehicle's rental agreement. *Id.* The officers decided to put the defendant in the back of their police vehicle to question him about the rental agreement. *Id.* Once the dog arrived, and without consent, the K-9 conducted a sniff of the vehicle and alerted to several areas of the vehicle where the officers found firearms. *Id.* at *5. The district court, relying on *Rodriguez* and the panel decision in *Campbell*, found that the traffic stop was unreasonably prolonged once the officer had finished writing the ticket and reengaged in questioning the passengers about unrelated crimes without reasonable suspicion. *Id.* at *9. The district court explained that the other officer's unrelated questioning did not prolong the traffic stop because it occurred while another officer was working on the ticket. *Id.* However, once the officer had finished checking the information and reengaged in unrelated questioning, that conduct prolonged the traffic stop in violation of the Fourth Amendment because the officers lacked reasonable and articulable suspicion of ongoing criminal activity. *Id.* The district court granted the defendant's motion to suppress and concluded that suppression of the evidence was warranted.[6]

---

[6] The United States appealed the Southern District of Ohio's suppression ruling to the Sixth Circuit, Docket No. 20-4084, but that appeal was subsequently voluntarily dismissed and a motion to dismiss the indictment was filed and granted by the district court.

*Chivers* is inapposite. The district court determined that the officers abandoned the traffic stop because they questioned the occupants of the vehicle after they had "run[ ] [the] required checks" and had "all of the information necessary to issue the citation." *Id*. at *10. Thus, the court determined, the officers "brought stop-related activities to a halt [and] undeniably prolonged the stop." *Id*. Here, the traffic stop was ongoing until the officers were able to confirm the identity of both the driver and passenger. Questions "unrelated to the traffic stop" are permissible "during the time 'when tasks tied to the traffic infraction [were]—or reasonably should have been' ongoing." *Whitley*, 34 F.4th at 530 (quoting *Rodriguez*, 575 U.S. at 354). As discussed, the officers had the driver and Lang exit the vehicle for legitimate safety reasons. When the driver exited the vehicle, Officer Feldman obtained her consent to search the vehicle. (R. 26 at Page ID 71-72, 86; Joint Ex. 1 at 6:18). Officer Feldman then confirmed her information and ran it with dispatch. (R. 26 at Page ID 73-74; Joint Ex. 1 at 8:24-10:15). Officer Rowland testified that he was unable to check Lang's identifying information until after Officer Feldman had completed his search of the vehicle. (R. 26 at Page ID at 108-09). After running Lang's information, Officer Rowland double checked with the driver whether that information was in fact correct. (*Id*. at Page ID 112; Joint Ex. 2 at 37:30). In other words, the tasks related to the traffic stop were ongoing; thus, any unrelated questioning did not prolong the stop and no independent reasonable suspicion was necessary. *Whitley*, 34 F.4th 530.

    **B.    Even if the officers prolonged the traffic stop, they did so based on independent reasonable suspicion**

Because the removal of the occupants from the vehicle did not prolong the traffic stop, the reasonable suspicion inquiry is not limited to, as Lang suggested (*see* R. 27 at Page ID 130), what was known to the officers at that time. The circumstances of the traffic stop created reasonable

suspicion of ongoing criminal activity and it was therefore proper for the officers to continue to detain the driver and Lang.

In general, reasonable suspicion involves officers making "commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *Wardlow*, 528 U.S. at 125). Courts consider the totality of the circumstances when determining whether an officer has developed reasonable suspicion of criminal activity. *United States v. Stepp*, 680 F.3d 651, 664 (6th Cir. 2012) (citation omitted). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry*, 392 U.S. at 21); *see also United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) ("To detain the motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct.") (quotation omitted). The officer "must point to specific and articulable facts that are more than an ill-defined hunch." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (internal quotations omitted). "Police officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citations omitted). The Supreme Court has also "recognized that the concept of reasonable suspicion is somewhat abstract" but explained that it has "deliberately avoided reducing it to a neat set of legal rules." Finally, "newly discovered

14

information 'can create reasonable suspicion to detain the driver longer in order to investigate other crimes.'" *United States v. Stevenson*, 43 F.4th 641, 648 (6th Cir. 2022) (quoting *United States v. Sheckles*, 996 F.3d 330, 345 (6th Cir.), *cert. denied*, 142 S. Ct. 717 (2021)).

Lang argued that he had a legitimate explanation for the digital scale, and that his nervousness and refusal to provide identifying information cannot be considered in the reasonable suspicion analysis. In support of the claim that a person's refusal to provide identifying information cannot be considered, Lang again relied on *Chivers*. (*See* R. 27 at Page ID 133). However, in *Chivers*, the court stated that "a citizen's 'refusal to listen or answer does not, *without more*,' provide 'reasonable, objective grounds' to suspect criminal activity." 2020 WL 5757135, at *11. (emphasis added) (quoting *Florida v. Royer*, 460 U.S. 491, 498 (1983)). Officer Feldman testified that several things *in addition to* Lang's refusal to give his identifying information provided reasonable suspicion of criminal activity. (R. 26 at Page ID 83, 96-98, 101) (digital scale, driver's hesitancy to exit the vehicle, both occupants' nervousness). *Chivers* looks to a Ninth Circuit decision which held that "demanding a passenger's identification is not part of an officer's mission during a traffic stop." *Id*. (citing *United States v. Landeros*, 913 F.3d 862, 868-70 (9th Cir. 2019)). However, there is Sixth Circuit precedent to the contrary. *See United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (finding "it [ ]appropriate for [an officer] to check both whether [the passenger] and [the driver] had valid identification and whether they had any outstanding warrants"); *see also United States v. Alexander*, 467 F. App'x 355, 362 (6th Cir. 2012) ("In this circuit we have held that in situations similar to the present case, an officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing by the passengers.").

In support of his claim that nervousness is not a proper factor for reasonable suspicion, Lang relied on *United States v. Stepp*, 680 F.3d 651 (6th Cir. 2012). (R. 27 at Page ID 134). To be clear, in *Stepp* the Sixth Circuit concluded only that "nervousness is an *unreliable* indicator," not that nervousness should never be considered. *Id*. at 665 (emphasis added). In fact, the Sixth Circuit concluded that "[a]lthough many of the government's factors when considered individually are weak indicators of criminal activity, when combined with the occupants' past history of narcotics activity and their vague travel plans, the totality of the circumstances supports the existence of reasonable suspicion." *Id*. The only limitation ordinarily placed on nervousness as a factor in the reasonable suspicion analysis is that it is "not a ground sufficient in and of itself." *United States v. Wilson*, 506 F.3d 488, 495-96 (6th Cir. 2007). Instead, "nervousness is generally included as one of several grounds for finding reasonable suspicion." *Id*.; *see United States v. Simms*, No. 20-9-DLB-EBA, 2020 WL 7769092, at *7 (E.D. Ky. 2020) (officer's "suspicions were bolstered by [the driver's] name not being on the rental agreement, his nervousness, and his improbable travel plans"). Thus, the officers' reliance on nervousness, in addition to the other factors, is not improper.

Finally, Lang argued that "[w]ithout more and given Mr. Lang's detailed explanation for the purpose of the digital scale and coins in his possession, the digital scale is not sufficient to create reasonable suspicion." (R. 27 at Page ID 135). Lang argued that "possessing a scale is an additional datapoint weighing in favor of reasonable suspicion [only] *if* other conduct suggestive of drug activity is observed." (*Id*.) (quoting *Whitley*, 34 F.4th at 534). But that was not the only information that connected Lang with drug use. During her interview with Officer Feldman, the driver indicated that Lang was known to have used methamphetamine. (R. 26 at Page ID 72; Joint Ex. 1 at 6:18). Notably, Officer Feldman's interview took place while Officer Rowland was trying

16

to confirm the identity of Lang—a task tied to the traffic stop. *Rodriguez*, 575 U.S. at 355; *Alexander*, 467 F. App'x at 362. In other words, Officer Feldman's drug-related questioning of the driver "d[id] not measurably extend the duration of the stop." *Whitley*, 34 F.4th at 530 (quoting *Rodriguez*, 575 U.S. at 355). Officer Feldman's observation of the digital scale, combined with the driver's indication that Lang previously used methamphetamine, provided reasonable suspicion that the digital scale might be a "tool of the drug trade." *Id*. at 534 (quoting *United States v. Frazier*, 249 F. App'x 396, 402 (6th Cir 2007)); *see United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005) ("In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot.").

    **C.**    **The officers had probable cause to search Lang's person**

Warrantless searches "are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (quoting *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)). "Under the 'search-incident-to-a-lawful-arrest' exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest." *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004) (quoting *United States v. Robinson*, 414 U.S. 218, 234-35 (1973)). Among the reasons for this exception is "the need to preserve evidence on his person for later use at trial." *Id*. The Supreme Court has extended the rule to "permit an officer to conduct a full search of an arrestee's person *before* he is placed under lawful custodial arrest." *Id*. However, law enforcement may conduct a pre-arrest search of a person only if "'the formal arrest follow[s] quickly on the heels of the challenged search of . . . [his person]' and the fruits of that search are not necessary to sustain probable cause to arrest him."

17

*Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 116-19 (1998)). In other words, the officer's search of Lang's person was proper if they had probable cause to arrest him, the arrest quickly followed the search of his person, and the evidence obtained as a result of his arrest was not necessary to establish probable cause in the first instance.

Lang challenged the officers' search of his person on the sole ground that the items seized from the search of the vehicle did not provide probable cause to believe that the items were drug paraphernalia in violation of KRS § 218A.500. However, the Court agrees with the Government's position that the officers had probable cause to arrest Lang for providing false identifying information to the officers in violation of KRS § 523.110.[7] In other words, Lang's challenge to the officers' probable cause to arrest him for possessing drug-paraphernalia is irrelevant. *See United State v. Coleman*, 458 F.3d 453, 458 (6th Cir. 2006) ("It is [ ] immaterial that [the defendant] was ultimately charged with an offense different than that which provided the legitimate probable cause justifying the search.").

Lang provided false information to Officer Rowland during the encounter. (R. 26 at Page ID 106-10; Joint Ex. 2 at 4:05-30:35). Lang also said that he did not have an ID. (R. 26 at Page

---

[7] "[S]tate law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 215 (6th Cir. 2011). KRS § 523.110 states:

> (1) A person is guilty of giving a peace officer false identifying information when he or she gives a false name, address, or date of birth to a peace officer who has asked for the same in the lawful discharge of his or her official duties with the intent to mislead the officer as to his or her identity. The provisions of this section shall not apply unless the peace officer has first warned the person whose identification he or she is seeking that giving a peace officer false identifying information is a criminal offense.
>
> (2) Giving a peace officer false identifying information is a Class B misdemeanor.

KRS § 523.110. Moreover, "[a] peace officer may make an arrest instead of issuing a citation for a misdemeanor committed in his or her presence if the misdemeanor is [a] violation of KRS . . . 523.110." KRS § 431.015(1)(b).

18

ID 107-08). Officer Rowland asked Lang for identifying information, and Lang refused. (*Id.*). Officer Rowland testified that he and Lang had a "back and forth" about providing identifying information. (*Id.*; Joint Ex. 2 at 4:30-11:00). Lang ultimately identified himself as Nicolas Jason Lang and gave a date of birth. (R. 26 at Page ID 108-09; Joint Ex. 2 at 11:05-12:12 (Nicholas Lang), 23:15 (middle name Jason)). However, Lang did not provide a social security number. (R. 26 at Page ID 109; Joint Ex. 2 at 22:35). Officer Rowland informed Lang that providing false identifying information to a police officer is an arrestable offense in Kentucky. (R. 26 at Page ID 110; Joint Ex. 2 at 30:14). Lang confirmed that the information he provided was accurate. (*Id.*). Officer Rowland testified that he could not immediately check the information provided by Lang because Officer Feldman was "still dealing with the [driver] and then Officer Feldman began searching the vehicle when I was talking with the [driver] and Mr. Lang." (R. 26 at Page ID 108-09).

Officer Rowland testified that it would be "very easy to find somebody if they have any prior cases." (R. 26 at Page ID 111). Officer Rowland further testified that the system did not return a hit when using the information provided by Lang, leading him to believe that Lang had not been truthful because Lang previously said he had been in jail for an assault conviction. (*Id.* at Page ID 112; Joint Ex. 2 at 30:35-37:30). Officer Rowland clarified that he did not run the name Lang initially provided upon exiting the vehicle (i.e., his real name, Adam Lang) because Officer Rowland forgot his first name. (R. 26 at Page ID 115). When he completed the information check, Officer Rowland exited his cruiser and questioned the driver about Lang's identity. (*Id.*; Joint Ex. 2 at 37:30). The driver informed Officer Rowland that she knew Lang as "Nick." (*Id.*). Officer Rowland testified that at that point "he was under the belief that [Lang] was lying to [him] about [Lang's] name." (Page ID 112-13). Under these circumstances, the officers had probable cause

19

that Lang provided false information to them, they arrested Lang shortly after confirming that his provided information was in fact false, and the evidence obtained from that search—the methamphetamine, fentanyl, and pipe—did not play a role in their probable cause determination. Therefore, under the search-incident-to-lawful-arrest exception, the officers did not violate the Fourth Amendment when they searched Lang's person immediately before lawfully arresting him.

### III.   CONCLUSION AND RECOMMENDATION

In his Motion to Suppress (R. 18), Lang asks the Court to suppress evidence obtained through the search of his person. As explained above, the Government has shown that law enforcement did not impermissibly prolong the duration or scope of the traffic stop and had probable cause to search Lang's person without a warrant.  Lang has failed to show that he is entitled to suppression of any evidence because he has not demonstrated his Fourth Amendment rights were violated. Accordingly, **IT IS RECOMMENDED** that the Motion to Suppress (R. 18) be **denied**.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 474 U.S. 140, 142 (1985); *United States v. Walters*, 638 F.2d 947, 950-51 (6th Cir. 1981).

Signed this 19th day of December, 2022.



Signed By:
*Candace J. Smith*
United States Magistrate Judge

J:\DATA\Orders\criminal cov\2022\22-35-DLB-CJS R&R denyg mtn to suppress.docx